Leland E. Rosemond v. Commissioner.
Rosemond v. Commissioner
Docket No. 27947.
United States Tax Court
1951 Tax Ct. Memo LEXIS 167; 10 T.C.M. (CCH) 625; T.C.M. (RIA) 51205; June 29, 1951
David S. Galton, Esq., for the petitioner. Thomas R. Charshee, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves income tax for the calendar year 1946. Deficiency was determined in the amount of $5,831.85. After disposition of one issue by stipulation the remaining issue presented is the deductibility of a loss taken in the operation of a farm, which depends upon whether the farm was a hobby, or operated for profit. Findings of Fact The stipulated facts are so found. The petitioner, a resident of Scarborough, New York, filed his income tax return for 1946 with the collector for the fourteenth district of New York. In 1936 petitioner, then serving as New England sales *168 representative for Sonotone Corporation, manufacturer of hearing aids, and residing in Newton, Massachusetts, acquired a farm located in Newhampton, New Hampshire, a distance of about 90 miles from his residence and about 100 miles from his office. As such sales representative, petitioner organized dealers, created dealer organizations, employed, trained, supervised and replaced dealers and, in connection the with, traveled constantly. At that time, petitioner was himself in debt and insolvent, his assets exceeding his liabilities, and petitioner lived solely on his income as sales representative for Sonotone Corporation. The farm was acquired by petitioner from his father-in-law in payment and satisfaction of the latter's indebtedness to petitioner in an amount approximating $8,000 to $8,500. The farm, situated in hilly country, consisted of 18 acres, only about two of which, at most, were tillable, the balance being grown up with small brush and shrubs, and occupied by the buildings thereon. The buildings consisted of one large house with a few connecting sheds, a connecting barn and another building; of the number of buildings on the farm, only one was a residence. The buildings *169 were run down and in ruin, there being practically no roofs, the piling on the barn being gone, the residence and sheds all having holes therein, and some of the chimneys having fallen down. There was no brook or other water on the property, except for water available for household and farming purposes. From the time of acquisition of the property in 1936, to 1940, petitioner carried on no farming activities of any kind thereon and did not reside thereon. His activities with respect to the property during that period consisted solely of making needed repairs, borrowing the money required to permit the making of such repairs and to prevent a worsening of its condition. In the latter part of 1936, petitioner was transferred by his employer from Boston, where his office had been, to New York City, to act as sales representative for an area which at first comprised the City of New York, New Jersey and a part of Pennsylvania, and subsequently included therein part of New England, New York State and more of Pennsylvania. Because of the petitioner's transfer, he and his family moved to Westchester County, State of New York, where they took up residence at first in Crestwood, and then *170 in Scarsdale, both of which places are at least 300 miles distant from the farm. His children went to school in Westchester County, and the family's social activities were carried on in Westchester County. Petitioner started operation of the farm in 1940 because he felt that it offered a possibility of making money, because with war in Europe, the United States would become involved and that raising foodstuffs would be profitable. Petitioner was born and raised on a farm. He believed he had some knowledge of farming. In 1940, he employed a regular New Hampshire farmer and his wife to carry on farm activities for a monthly compensation of $75, plus such food products as were grown or raised on the property and a home thereon. In the beginning the farmer began to raise cattle, sheep and chickens to a limited extent. The farm being completely unequipped when petitioner acquired it, he purchased all equipment needed, including, but not limited to, a tractor, discs, ploughs and stonedrag. To carry on his operations, he had to clear some of the land. Later he raised chickens and marketed eggs. Still later he changed to producing hatching eggs. At one time he had about 1,500 laying hens. *171 Throughout the years 1940 to 1946 petitioner continued to raise animals such as pigs, cows and lambs, in addition to chickens, in part to supply the farmer with products, in part to provide foodstuffs for the chickens and animals, and to sell beef, veal and hog products, as well as dressed chickens. Petitioner converted one entire side of the barn, consisting of two stories, into a complete poultry place. Later petitioner purchased 55 more acres of land, adjacent to the 18 acres. The 55 acres were largely woodland, covered with woods and shrubs. By 1946 some of the land had been cleared off so that there were about 15 acres tillable, including the two acres on the original 18-acre tract. The 13-acre tract is all tillable or in pasture, making 20 acres tillable now. In his income tax return for 1946 petitioner reported the sale of 20 acres of land, without buildings, acquired in 1942 for $400 and sold for $700, with profit of $300, of which $150 was reported as capital gain. Petitioner used the land for pasture and for growing hay and arranged with a neighboring farmer to fertilize his land in exchange for its hay crop on a share basis. During the period between 1936 and 1946, *172 petitioner expended the sum of $35,000 or more in capital improvements, which were not deducted, except by way of depreciation, on his income tax returns as expenses. The petitioner did not realize a profit from the operations of the farm during any of the years, commencing with the calendar year 1940, when petitioner first commenced operations, and ending with the year 1946, the year here in issue; and the income realized from farm operations, the expenses and depreciation incurred in connection therewith, and the losses suffered during the said calendar years 1940 to 1946, both inclusive, are as follows: Farm
Farm
Farm
Year
Income & Sales
Expenses
Depreciation
Net Loss
1940
$ (1.68)
$ 1,357.58
$ 241.37
$ 1,600.63
1941
66.17
3,812.14
547.68
4,293.65
1942
993.82
6,208.11
1,068.99
6,283.28
1943
2,370.52
7,490.99
1,436.39
6,556.86
1944
4,536.78
10,624.31
1,778.51
7,866.04
1945
8,461.74
12,430.93
1,852.18
5,821.37
1946
3,188.54
9,621.40
1,306.84
7,739.70
Total
$19,617.57
$51,545.46
$8,231.96
$40,161.53 He kept separate records of the farming operations. During 1940-1946 petitioner was constantly in touch as *173 to farm operation with governmental bureaus, including the University of New Hampshire, the U.S. Department of Agriculture, the government in Concord, and mainly in touch with the County Agent. He got farmers through the Farm Bureau and a Government man. He had advice as to raising chickens; and made the change to hatching eggs. Petitioner advertised some of his products for sale in the Farm Bulletin (Market Bulletin) published by the State of New Hampshire, and sold farm products at wholesale to Swift and Meredith Exchange, at Laconia or at Franconia, New Hampshire. During the calendar year 1946, petitioner's gross income from the sale of his farm products was $3,069.94, thus: From the sale of live stock raised (6
swine)
$ 257.15
From the sale of produce raised, thus: 6 tons of hay
155.00
Dairy Products
58.30
Eggs (3,583)
1,711.50
Meat Products
132.50
Dressed Poultry (408)
755.49
$3,069.94
Petitioner reported in his income tax return for 1946 farm expenses as follows: Labor hired
$2,560.15
Feed purchased
3,133.53
Seed and plants purchased
79.14
Supplies purchased
113.76
Cost of repairs and maintenance
1,494.48
Fertilizers and lime
128.16
Veterinary and medicine for livestock
34.50
Gasoline, other fuel and oil for farm
business
414.93
Taxes
208.33
Insurance on property
246.47
Water rent, electricity and telephone
330.18
Freight, yardage, express and trucking
108.91
Loss of Holstein calf
11.00
Small tools, etc.
110.03
Salvation Army donation
5.00
Miscellaneous Expenses
251.03
Cost of processing food for resale
198.55
Cost of pigs raised and sold
37.50
Cost of baby chicks
155.75
Total
$9,621.40
*174 The schedule of farm income and expenses for the calendar year 1946 showed, in detail, depreciation, deducted from farm income, in the amount of $1,306.84. Petitioner constantly endeavored to reduce his expenses, seeking a farmer without a family, employing his son to assist in the work (without reporting his compensation as an expense) and helping out himself. During the war years petitioner spent any vacation time he had at the farm. He did haying and other physical work. He helped the farmer do the haying because one man could not do it. Sometimes there were weekend guests and sometimes they helped with the work. Petitioner was in constant touch by telephone and letters with the farm activities. Petitioner maintained a complete set of books of account, employing an accountant to keep the records. He maintained a separate bank account, with a separate checkbook, for his farming operations, and all moneys realized from the sale of his farm products, including the proceeds of sales to himself, were deposited in the separate farm bank account, from which all bills pertaining to his farm operations were paid. He deposited moneys in the farm bank account when necessary so all bills *175 for farm activities could be paid therefrom. No personal expenditures of any kind were paid from the funds in the farm bank account. Such of the farm products as were used by petitioner and his family were paid for by him, at the same price at which such products were sold at the farm to others. Out of the total farm products sold, petitioner used about 5 or 6 per cent during 1946. Petitioner had difficulties getting farm help, and with them. The first farmer, employed in 1940, the year operations were commenced, became ill in March 1941 and died. The farmer employed to replace him was drafted in October of the same year. Some of the farm help were dishonest, hiring their own relatives, thereby increasing petitioner's payroll expense, and stealing cash and timber, necessitating litigation. From 1940 to 1946 he had six or seven different farmers. The lack of tillable acreage made the raising of chickens, which require changes every year to avoid becoming diseased, difficult and accounted for losses suffered. The cost of changing operations from the raising of market eggs to the raising of hatching eggs also accounted for losses suffered since petitioner was required to have the hatching *176 chickens vaccinated, to use the state veterinarian service, and to have roosters, none of which was necessary when market eggs were raised. Both the increased cost of farm help, and the number thereof, were also responsible for losses suffered, the farmer's cash compensation having risen from $75 a month in 1940 to $135 a month in 1946, and the number of help having increased from one in 1940 to three in 1946. The elimination of price control in 1946, with an increase in the price of grain from $2.70 a bag to $5 a bag, and a decrease in the price of chickens and eggs, resulted, in part, in the losses suffered in 1946. There being but one residence building on the premises, petitioner's family (a wife and two children) used the same as a home, along with the farmer and his family, during the summer, from about July to the end of August. Petitioner spent his week-ends there. They used the same kitchen as did the farmer, but had three or four rooms set aside. They did nothing to beautify the place, other than to paint buildings. The farm residence was not adapted as a residence or summer estate for the petitioner and his family. The house had no recreational facilities, and the farm *177 had no water for swimming or fishing, or leisure activities. At first the house had no heat. He had to rebuild the farm house, in order for it to be habitable for an all-year round home. Though the farm is in hilly country the petitioner did no hunting or fishing, on or from the farm. The farming was classified as essential, with enough points to give the farm one and one-half of the draft status, and by the Ration Board given on the truck certificate of necessity the gas rationing for carrying on an essential farm. Petitioner's maximum annual income, earned for his services with Sonotone Corporation, was $23,000 in 1946, representing a gradual increase from $13,000 or thereabouts in 1940. Throughout the years 1936 to and including 1946, petitioner had no income-producing investments other than some Sonotone Corporation stock which he was permitted to purchase, and relied solely on his own activities for his income. Since 1946 the farm has done better, but in 1950 there was very little profit, if any. It may have "broken even." The Commissioner also disallowed $7,739.70 claimed as loss in operation of the farm for 1946. Petitioner operated the farm during 1946 for profit, *178 and it was not a hobby, but a trade or business. Opinion Our question is whether the petitioner's farm was a hobby, or was operated by him for profit or as a trade or business, during 1946. On the record before us the answer is not easy. We have found the facts in some detail, and need not repeat them here. They contain indications of a hobby carried on by a person engaged in another and lucrative business, consistently, year after year, at a loss. The fact of such repeated losses is significant. Yet alone it is not controlling. Regulations 111, Section 29.22(a)-7, quoted and relied on by respondent, reads: "* * * A person cultivating or operating a farm for recreation or pleasure, the result of which is a continual loss from year to year, is not regarded as a farmer." Thus, it appears that continued losses alone do not mean that farming is not carried on, but that farm operation as recreation or pleasure together with such continual loss, brands the operator as no farmer. Intent too, of course, enters the picture, as does the extent and character of the use of the property by the petitioner and his family. We think that petitioner has overstated his intent, such as anticipating *179 the war and its demand for food products. This smacks of hindsight rather than foresight. The family did use the farm for summer vacations and recreation purposes. Nevertheless, the record as a whole convinces us that the farm was not a mere hobby with the petitioner. His work, in haying and other work on the farm, by no means appears as recreation. However poor his judgment in attempting to make the farm profitable, he made that effort. He consulted county agents, state university men, and the Department of Agriculture about his problems. Careful accounts were kept. His family paid to the farm account for what they consumed. Though the tillable acreage of the place was not large, the principal interest was in chickens, for which great space was not necessary. At one time there were up to 1,500 laying hens. For better profit, change was made from market eggs to hatching eggs. The continued trouble in procuring farm help, and difficulties with the help procured, and the petitioner's effort nevertheless to continue the farm experience, indicate to us that the farm was not being operated for pleasure in general, despite use of it as a summer home. He spent no time in fishing or hunting, *180 either on or from the farm. We believe that the petitioner hoped to make the farm profitable. It would be unreasonable to think that the difficulties encountered were continued merely for pleasure. On all the facts we conclude and hold that the farm was not a hobby, but was operated for profit and that the Commissioner erred in denying the deduction of $7,739.70 loss from farm operations in 1946. Decision will be entered under Rule 50.