Per Curiam:
This case comes before the court on defendant’s motion, filed April 11, 1977, requesting that the court adopt the recommended decision of Trial Judge Lloyd Fletcher, filed March 1, 1977, pursuant to Rule 134(h), as the basis for its judgment in this case since plaintiffs have failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge’s recommended decision, as hereinafter set forth* it hereby grants defendant’s motion and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are not entitled to recover and their petition is dismissed.
OPINION OF TRIAL JUDGE
Fletcher, Trial Judge:
This action was brought to recover alleged overpayments of Federal income tax by the plaintiffs (sometimes hereafter referred to as the "taxpayers”) for the years 1966 through 1971. They seek a refund of $13,392.43 in assessed deficiencies, $2,099.63 in assessed interest, plus statutory interest. A substantial portion of the deficiencies was assessed because certain deductions were disallowed by the defendant under the contention that the taxpayers have not shown that the recreational type property involved was acquired or utilized with a reasonable expectation of realizing a profit therefrom.
Plaintiffs, Dr. James B. and Alice J. Monfore, are husband and wife and reside in Miller, South Dakota. Prior to the fall of 1968, they lived in Winner, South Dakota. Dr. *709 Monfore is, and has been at all relevant times, engaged in the full-time practice of medicine. He and his wife have four children whose ages in 1964 ranged from infancy to 10 or 11 years.
The Monfores timely filed joint Federal income tax returns for the years at issue, and on each return they claimed deductions arising out of their ownership and maintenance of vacation property owned by them and located in a resort area known as the Kenora District of Ontario, Canada. Upon audit by the Internal Revenue Service, the deductions thus claimed were disallowed, and other adjustments (not here in issue) in the plaintiffs’ tax liability were made. These adjustments resulted in total assessments as follows:

Year Deficiency

1966 $1,572.82
1967 1,847.42
1968 2,791.10
1969 2,379.59
1970 1,529.27
1971 3,272.23
For the years 1966, 1967, and 1968 interest was assessed and paid in the amount of $928.86. Also, interest for the years 1969, 1970, and 1971 was assessed and paid in the amount of $1,170.77.
Formal and timely claims for a refund were filed by plaintiffs who, relying on sections 162, 167, and 212 of the Internal Revenue Code, alleged that many of the disallowed deductions were valid in that they were for expenses incurred with respect to property which was operated as a trade or business and held for the production of income. These claims were denied by the District Director of Internal Revenue, and thereafter plaintiffs timely filed their petition in this court.
As stated, the total assessed deficiency ($13,392.43) did not result solely from the disallowance of deductions attributable to the resort property at issue, but rather were partially due to other unrelated adjustments made to plaintiffs’ income tax returns. Their claims for refund, however, were confined only to those portions of the *710 assessed deficiencies which arose out of the disallowed deductions with respect to plaintiffs’ Canadian vacation property. As stated in the report of the revenue agent and challenged in plaintiffs’ claims, the disallowed deductions which are at issue here are as follows:

Year Deduction

1966 $5,615.85
1967 5,624.73
1968 6,405.00
1969 4,712.80
1970 4,143.00
1971 4,473.63 [1]
In 1964, Dr. Monfore who enjoys hunting, fishing, and other outdoor activities, took two of his young sons and a personal friend on a fishing trip to the Kenora District of Ontario, Canada. The purpose of the trip was recreation and relaxation. This was Dr. Monfore’s first trip to this particular area, although he had fished in other parts of Canada previously. While in the Lake of the Woods area during this trip, he saw an island which he learned was for sale. The island was six-tenths of an acre in size and located in the Sabaskong Bay, Lake of the Woods, District of Kenora, Ontario, Canada. Dr. Monfore was attracted to this property, and later that year he and Mrs. Monfore returned to Canada as prospective purchasers of the island. In the late fall they bought it for a total purchase price of $40,000, payable over a five-year period. After payment of the full contract price over the stated number of years, their deed was registered and recorded in 1970.
The general location of plaintiffs’ Canadian property is a beautiful and well-known vacation and resort area with numerous resort activities located throughout the region. This lovely area is visited extensively (except during the winter months) by vacationers, fishermen, swimmers, water skiers, and other sports enthusiasts. The result has been considerable commercial development, but there are *711 also large portions of land owned and used as private accommodations.
The Monfore island had never been used commercially prior to its purchase by plaintiffs and was not licensed for that purpose by the Canadian authorities. When it was acquired by plaintiffs, the island contained five small frame or log cabins, including a frame structure used as a wash house or shelter house, a boat house with shop, a small frame building used for storage and a deep freezer, and an outside privy. The cabins were somewhat dilapidated and in need of modernization.
Dr. Monfore testified that he had done some investigation of the property’s potential as a resort before he applied for a license. Specifically, he said that he visited other resorts in the area and studied tourist oriented magazines and a publication which analyzed potential development in northwest Ontario. Other than this, he did not spend any significant amount of time or effort in investigating or researching the commercial potential of the island. He did not look at, or seriously consider, any other properties which might have been for sale in the area and which might have been better suited as tourist resorts or which were already licensed, or more readily licensable, for such usage.
Neither the plaintiffs nor Dr. Monfore’s father, who sometimes acted as their agent in managing the property, had any experience in operating a commercial rental establishment for vacation purposes or otherwise. Nor did Dr. Monfore ever hire anyone who did have such experience. Despite initial financial losses suffered during each year of this island’s operation, plaintiffs did not seek any experienced help or guidance but relied on their own methods.
Dr. Monfore had begun the practice of medicine not very long prior to his purchase of the island. He never intended that possible income from the rental of the island facilities would be a major source of income. Dr. Monfore intended to continue his full-time medical practice and did so. In fact, it appears from the plaintiffs’ income tax returns that Dr. Monfore’s practice was a steadily growing one. From his testimony, it was apparent that the demands of Dr. *712 Monfore’s profession kept him from spending as much time on the island as he would have liked to have done.
From the plaintiffs’ home in South Dakota, it is a ten-hour automobile drive plus a short boat ride to the island. When plaintiffs traveled by private aircraft, the trip consisted of a three-hour flight, a one-hour car ride, and a short boat ride. Dr. Monfore purchased a light airplane in 1965 and began taking flying instructions. He received his private pilot’s license in the same year. In subsequent years he used the airplane for transportation to and from the island, in his medical practice, such as attendance of professional meetings, and for other uses. It was never used to transport paying guests to or from the island. When flying to the Canadian property, it was Dr. Monfore’s practice to land and leave his airplane at the closest United States airport to the Canadian border. From there he used a car, which he owned and left at the airport, for the purpose of traveling the remaining distance from the airport to a marina where he could board a boat to reach the island.
The island is located two miles from the shore and is not visible from the mainland. There is no telephone service to the island itself. Access to the island from the mainland can be had from the Government wharf boat launching facility which has no other services, from Milie’s Resort which is a tourist resort with full facilities, or from Dalseg’s Marina, which has many but not all facilities. Milie’s is the most convenient point of embarkation to the plaintiffs’ property, and other resort owners in the area also make use of Milie’s facilities.
Dr. Monfore realized at the time when he and his wife purchased the property that they would be required to obtain a Canadian license before they could operate the island as a tourist resort. Prior to purchase, however, he did not inquire about the specific requirements to be met before obtaining such a license. He, first made formal application for a tourist facility license in February 1967, which application was acknowledged by letter of March 16, 1967. The property was inspected by the Canadian authori *713 ties on May 18, 1967, and by letter dated June 5, 1967, plaintiffs’ application for a license was officially rejected.
The 1967 rejection letter stated that cabin No. 1 (the main cottage) could not be considered a part of the resort since it was considered to be the owners’ cottage.[2] The letter further stated that cabin No. 2 (referred to as Cabin Number Three in the letter) was acceptable for two adults and two children and that cabin No. 5 was acceptable only when used in conjunction with cabin No. 2. Cabin No. 3 (called Cabin Number Two in the letter) was rejected as having bedrooms which were too small. Cabin No. 4 was rejected because its ceilings were too low. The letter concluded that the property was not licensable because: (1) only one cottage was suitable, (2) there were insufficient toilet facilities, and (3) all the other buildings did not meet the requirements of the Canadian regulations. There is no evidence to indicate that the Canadian authorities required any alterations or additions which were not mentioned in the 1967 rejection letter.
Dr. Monfore testified to having had earlier, oral contacts with the licensing authorities in Canada, but was unsure of the exact date or dates. In any event, as stated, the first official contact was made in 1967 and there is insufficient evidence to indicate that any of the work on the property prior to the summer of 1967 (before the June 5, 1967 rejection letter) was done in response to any licensing requirements.
The following is a summary of the status of and renovation activities with respect to the various shelters:
Cabin No. 1: (This cabin was known as the main cabin and was used by the plaintiffs and their family when they were on the island. It was also held out for rent.)
A. Existing Facilities: The cabin was completely modernized when it was purchased by the plaintiffs. It had hot and cold running water, an enclosed flush toilet and shower, and a modern kitchen.
B. Comments in the 1967 Rejection Letter: The licensing agency stated that this cabin could not be considered a *714 part of the proposed resort since it was the owners’ cottage.
Cabin No. 2: (This cabin was erroneously referred to as Cabin Number Three in the 1967 rejection letter.)
A. Existing Facilities: Here there was a kitchen with hot and cold running water but no bath.
B. Requirements for Licensing: The 1967 rejection letter stated that this cabin was acceptable for commercial rental to two adults and two children. Dr. Monfore believed that no further changes were required for this cabin.
C. Improvements Made: Dr. Monfore stated, however, that in order to make the cabin more attractive, a 6 by 8 foot leanto was added, and in addition, hot and cold running water was then installed along with a flush toilet and septic tank.
Cabin No. 3: (This cabin was erroneously labeled Cabin Number Two in the 1967 rejection letter.)
A. Existing Facilities: This cottage had but one large room without plumbing or bath.
B. Requirements for Licensing: Before they were aware of the licensing requirements with regard to bedroom size, the plaintiffs partitioned this cabin into two separate bedrooms. The 1967 rejection letter notified the taxpayers of the necessity of larger bedrooms, and the rooms were later enlarged to meet this requirement. No other deficiencies were noted in the 1967 letter.
C. Improvements Made: The bedrooms were enlarged as required. In addition, plumbing, wiring, and a toilet were added over the years, along with kitchen facilities.
Cabin No. 4: (This cottage was also called the "bunk house”.)
A. Existing Facilities: This cabin contained two rooms with sleeping facilities but no bath.
B. Requirements for Licensing: The rejection letter stated that the cabin’s ceilings were too low.
C. Improvements Made: No improvements were made to this shelter.
Cabin No. 5: (This cottage was also called the "hill house”.)
A. Existing Facilities: Here there was a large room with a kitchen area and hand pump but no bath.
B. Requirements for Licensing: The 1967 rejection letter stated that this cabin could be used only in conjunction *715 with cabin No. 2 but did not otherwise comment on its suitability as a tourist cabin.
C. Improvements Made: A pressurized water system, stove, and refrigerator were added. No structural changes were made.
The deficiencies as outlined by the 1967 rejection letter consisted primarily of bedrooms which were too small in one cabin, a roof which was too low in another, and inadequate toilet facilities. The enlargement of the bedrooms was accomplished in October 1971, the water system was unchanged as of September 1969, the additional toilets were added in cabins 2 and 3 in 1971, but the noncomplying ceilings were never raised. Although from time to time there was other work in progress on the island, and although it obviously made the facility more attractive for rental purposes, it does not appear to have been done with the overall objective of satisfying licensing requirements. As of the time of trial, two cabins (Nos. 4 and 5) still did not have toilet facilities.
Many additional alterations were made to the island facilities including, but not limited to, additions of two new boat docks, new kitchen appliances and furniture, and repairs to boats, boat motors, and the boat house. No evidence has been presented that these alterations and improvements were required by the Canadian authorities, although they undoubtedly resulted in a more pleasant place at which to vacation.
A license to operate the island as a tourist resort was issued to the Monfores on July 22,1971, but it licensed only two cottages, those previously termed cabins No. 2 and 3.
Dr. Monfore, accompanied by friends, generally opened the island each spring at the beginning of the fishing season, and closed the island again in the fall, also accompanied by friends. On these trips the participants, sometimes along with their families, did the work that was necessary for the protection and maintenance of the property and also relaxed, fished, and enjoyed the surroundings. This work would have been necessary regardless of the use to which the island was put.
Dr. Monfore had an arrangement with patients and friends which resulted in getting some of this work done on *716 the property at reduced, or no labor costs. These friends, sometimes with their families, came to the island to enjoy a vacation and in return to participate in the work that was going on there. By working about half of the time and vacationing about half of the time, these workmen, sometimes with their families, were permitted to stay on the island with little, or no, rental charge. However, in one instance, the plaintiffs hired a laborer who was paid and did not travel to the island with the additional prospect of a simultaneous vacation. The arrangement of trading work for vacation facilities continued even after the years in question.
Dr. Monfore’s parents (the H. S. Monfores) spent the summer season on the island during most of the years in issue. In 1965, H. S. Monfore was paid $400 for his work in maintaining and supervising work on the island. In 1967, he was paid $200, and in 1968 he was paid $1,102. Mr. and Mrs. H. S. Monfore helped with improvements, supervised activities on the island, attended to renters when they had them and generally helped to protect and preserve the property.
The plaintiffs and their children spent some time on the island throughout the period in issue in addition to that incident to opening and closing the property. During these years, some of the time spent on the island by the Monfore family was devoted to supervising and performing work required to obtain the tourist license along with other improvements, maintenance, and repairs. In 1966, the family spent at least one week on the island during the summer alone. In 1967, the family spent a week on the island along with Dr. Monfore’s brother, his brother’s family, and another group of friends. The family did not use the island during 1968 except for Dr. Monfore’s trips there to open and close the island facilities. The family spent a week’s summer vacation on the property in 1969, and Dr. Monfore and his two sons were also on the island for two days that summer. In 1970, Dr. Monfore and his sons stayed at the island on three occasions. They were accompanied by Dr. Monfore’s brother and his brother’s children on one of those visits. Dr. Monfore made ten trips to the island in 1971, accompanied each time by either his *717 wife, his friends, or his attorney. Where weight limitations permitted, he used his airplane for transportation on most of these trips.
In addition to the time spent on the island in these years, the Monfores vacationed in Kentucky in 1966, in California in 1970 or 1971 and spent three weeks in Mexico City in 1968.
There were several commercial resorts in the area of plaintiffs’ island at the time the property was purchased. Some were on islands, and others were on the mainland. The largest of these was Milie’s place which had about 20 cabins. Cedar Lake had 15 to 20 cabins. The smallest resorts had from six to eight cabins. When the plaintiffs received their 1971 permit, it covered only two cabins.
Commercial resorts in the area use a variety of advertising techniques. Signs are posted in the area and brochures, pamphlets, newspaper and magazine advertisements are purchased. Another important means of obtaining renters is by word-of-mouth and repeat visits by satisfied customers. The larger mainland resorts, of course, tend to use more formal means of advertising than do the smaller island resorts.
The plaintiffs did not advertise during the years at issue. Although the plaintiffs received their license in July 1971, the first advertisements that they purchased were in October 1971. This advertising consisted of classified ads in the Sunday editions of Minnesota and Iowa newspapers. The advertisements were similar to the ones placed in the Des Moines Sunday Register for three consecutive Sundays in June 1974, which read:
Lake of the Woods, Ontario, fishing, hunting, swimming, housekeeping cottage sleeps six, $150 a week. Phone . . ., no collect calls.
Color brochures were also prepared for distribution during the winter of 1975-76. There was and is no sign on the property itself which identifies it as commercial property. Other than an identifying sign near the resort dock, such signs are not common on any of the island resorts. The only sign on the plaintiffs’ property was one on the boat house which read "Monfore’s.”
*718 Even though the facility was not yet licensed as a tourist resort, in 1966 the taxpayers entered into an agreement with a mainland resort, Milie/s Resort, for rental of the facilities by Milie’s customers on those occasions when Milie experienced an overflow. Plaintiffs received a gross income of $236 less $56.20 which was apparently a rental commission due Milie’s, and had a net income from the arrangement of $179.80 which they reported on their 1966 income tax return. Although this arrangement was never entirely satisfactory to plaintiffs, it was nonetheless repeated in several subsequent years.
In 1968 the Monfores reported $200 of income, representing donations from various friends who had stayed on the island that year. This was the only instance when donations from friends were listed as income prior to the issuance of the plaintiffs’ first license in 1971. In that year, the taxpayers reported rental income from the Canadian property in the amount of $160. The only paying guests were the Bainters, who were personal friends of plaintiffs and who had used the island almost every year since its purchase by the Monfores. The Bainters had previously made arrangements with the Monfores to stay on the island and the plaintiffs would permit them to use it free of charge. On these visits, Max Bainter participated actively in the work activities on the island. At no time during the years at issue were formal fees set for the use of the island. No income was reported from the Canadian property except for that reported in 1966, 1968, and 1971.
Plaintiffs did not and do not now maintain a set of books recording the income and expenses of the island. Instead, they relied on canceled checks, bills, vouchers, and bank deposit tickets in preparing their income tax returns. Checks were written for island expenses throughout the years in question on various accounts, including from time to time Dr. Monfore’s medical office account and the Monfores’ personal bank account. This occurred even after a separate account was opened for the island activities.
For the' year 1966, the only records the plaintiffs had of their income from the island were three handwritten lists of names, dates, and amounts which were internally inconsistent. No records were kept of income reported in *719 1968 ($200) or 1971 ($160). Even after the island was licensed, the plaintiffs’ record-keeping procedures did not improve. A formal guest book was provided, but only a few guests actually signed it. The first entry is for 1973, the third season after the island was licensed, and there is only one entry for that year.
The plaintiffs have yet to make a profit from the operation of their island. In 1972 they reported $390 of income. Income in the amount of $650 was reported in 1973. Over $1,000 was received with respect to the property in 1974, but 1975 receipts were not that large. Since depreciation on the cabins alone has been claimed in the amount of $1,433 per year, to say nothing of improvement and maintenance expense, it is clear that the plaintiffs have never even approached a profit-making situation.
In the years after 1971, Dr. Monfore’s parents and sons have sometimes acted as resident managers of the property. In 1974 a friend was asked to spend the summer on the island to "help him (Dr. Monfore) get this thing going.” One person was hired by the taxpayers in 1974 after the friend had left the island. This was the only time that the plaintiffs hired anyone other than friends or relatives to manage the property. There is no indication that the plaintiffs ever hired anyone with experience in the resort business to advise or assist them.
Upon the facts thus summarized,[3] and as will be apparent from the applicable statutory provisions referred to below, the court is here presented with those grave difficulties attendant upon an endeavor to gauge the extent of a taxpayer’s tax consciousness by what has been called that "hazardous effort to probe his state of mind.” Cohen, Taxing the State of Mind, 12 The Tax Executive 200, 219. But, as Judge Learned Hand once remarked, "Nothing is more frequent in human relations than the effort to learn what goes on in others’ minds.” United Business Corp. of America v. Commissioner, 62 F. 2d 754, 756 (2d Cir.1933), cert. denied, 290 U.S. 635.[4] Despite the difficulties and *720 uncertainties inherent in piercing the thick fog of intention or motivation, here the applicable statutes make the effort inescapable.[5]
Section 162 of the Internal Revenue Code provides that a deduction shall be allowed for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.” Similarly, Section 212(2) permits a deduction for all ordinary and necessary expenses paid or incurred during the taxable year "for the management, conservation, or maintenance of property held for the production of income.”
Section 165 permits the deduction of any loss sustained during the taxable year and not compensated for by insurance, or otherwise, but with limitations as to losses by individuals. The pertinent limitation in this case is that the losses must have been "incurred in a trade or business,” or in a "transaction entered into for profit, though not connected with a trade or business.” Depreciation deductions are also permitted under Section 167 with respect to property held for the production of income and with respect to property used in a trade or business.
Under these sections, therefore, plaintiffs are entitled to deduct the expenses, losses, and reasonable depreciation allowances incurred with respect to their Canadian property provided they show an overriding profit motivation to acquire the property for use in a trade or business and that it was held thereafter for the production of income. In my opinion, they have not carried their burden of proof in this regard.
To be sure, holding a single property for rent may itself constitute the carrying on of a trade or business. See Lagreide v. Commissioner, 23 T.C. 508, 512 (1954); Hazard v. Commissioner, 7 T.C. 372 (1946). Also, under proper circumstances, rental property may qualify as property held for the production of income within the meaning of Section 212. Horrmann v. Commissioner, 17 T.C. 903 (1951). However, it is equally clear that if the taxpayer’s predominant purpose and usage of the property so held is for *721 personal or family recreation, no deduction for depreciation and maintenance expenses can be allowed. Carkhuff v. Commissioner, 425 F. 2d 1400, 1404 (6th Cir. 1970); Johnson v. Commissioner, 59 T.C. 791,814 (1973).[6]
Initially, it is important to recall that where a taxpayer claims a right to a statutory deduction, his burden of proving his entitlement thereto is far from light. Carkhuff v. Commissioner 425 F. 2d 1400, 1404 (6th Cir. 1970); and International Trading Co. v. Commissioner, 275 F. 2d 578, 584 (7th Cir. 1960), where the court observed:
All deductions, whether with respect to individuals, or corporations, are a matter of legislative grace, and unless the claimed deductions come clearly within the scope of the statute, they are not to be allowed. The burden to make that showing rests upon the taxpayer. (Emphasis supplied.)
In this case, therefore, it is the taxpayers’ burden to prove satisfactorily that the Canadian property was actually held for the production of income or was used in a trade or business, and this they have not done.
The cases are legion in which it has been held that a good faith intention to make a profit is an essential prerequisite to treatment of a property as a trade or business. See, e.g., Doggett v. Burnet, 65 F. 2d 191, 194 (D.C. Cir. 1933); Five Lakes Outing Club v. United States, 468 F. 2d 443, 445 (8th Cir. 1972); Lamont v. Commissioner, 339 F. 2d 377, 380 (2d Cir. 1964);.Iowa State University v. United States, 205 Ct. Cl. 339, 360, 500 F. 2d 508, 522 (1974); Adirondack League Club v. Commissioner, 55 T.C. 796, 816-17 (1971) (Dawson, J., concurring), aff'd, 458 F. 2d 506 (2d Cir. 1972). Similarly, property qualifies as being held for *722 the production of income only where it is shown that the taxpayer’s activities with regard to the property were primarily motivated by his desire for profit. Carkhuff v. Commissioner, supra at 1404; Coors v. Commissioner, 60 T.C. 368, 410 (1973); Johnson v. Commissioner, 59 T.C. 791, 814 (1973). There is no disagreement between the parties here that a showing of good faith intention to make a profit is necessary before sections 162, 165, 167 and 212 can apply in this case, and plaintiffs are correct in stating that the absence of actual profit is not determinative. Nonetheless, it is a factor to be considered in an analysis of whether the operation is of such a nature that in good faith the taxpayer could and did expect to make a profit therefrom. Carkhuff v. Commissioner, supra, at 1404. See also, Lamont v. Commissioner, 339 F. 2d 337 (2d Cir. 1964); Coors v. Commissioner, 60 T.C. 368, 410 (1973). The regulations state the question as follows:
. . . The question whether or not a transaction is carried on primarily for the production of income or for the management, conservation, or maintenance of property held for the production or collection of income, rather than primarily as a sport, hobby, or recreation, is not to be determined solely from the intention of the taxpayer but rather from all the circumstances of the case. For example, consideration will be given to the record of prior gain or loss of the taxpayer in the activity, the relation between the type of activity and the principal occupation of the taxpayer, and the uses to which the property or what it produces is put by the taxpayer. Treas. Reg. § 1.212-l(c).
Thus, it is clear that the existence of a profit motive is a question of fact and must be determined on the basis of the circumstances in each individual case. See Patterson v. United States, 198 Ct. Cl. 543, 553, 459 F. 2d 487, 493 (1972); American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1111 (1957), aff'd, 262 F. 2d 150 (9th Cir. 1958). The taxpayer’s subjective testimony as to his intent is to be, and has been, considered, but only to the extent that it is consistent with the other objective evidence in the case. For an example of where the subjective and objective evidence coincided, see Patterson v. United States, supra.
*723 In the final analysis, the best evidence of the taxpayer’s intent to make a profit must arise from his overt efforts to accomplish that result and, albeit to a lesser extent, his actual accomplishments in that regard. See Harold I. Snyder, 25 T.C.M. 1326, 1333 (1966) and Johnson v. Commissioner, supra.
Among the several indicia used by the courts to ascertain the existence of a profit motive are the manner in which the taxpayer acquired and conducted his enterprise. It has been held that, although business-like management and efforts to improve a property do not, of themselves, establish a profit motive, Schley v. Commissioner, 375 F. 2d 747 (2d Cir. 1967), it is fair to look to the overt actions of a taxpayer to see whether they indicate efforts to exercise prudent, professional management in contrast to somewhat cavalier and personal decision-making. Cf. Patterson v. United States, supra. Thus, one who purchases an investment property would be expected to conduct a prepurchase investigation in a business-like way to ascertain its profit-making potential and to uncover any possible obstacles to its producing a profit, especially where resort property is involved. Cf. Wachter v. United States, 75-1 U.S.T.C. ¶ 9172, at 86,230 (W.D. Wash. 1974). This is not to say that a taxpayer is held to the standards of an investigator for a new Disney World location, but where the taxpayer makes no inquiry or inquires only in a desultory manner, the courts have tended to discount his later claims of a profit-seeking motive. See, e.g., Johnson v. Commissioner, supra. In this case, Dr. Monfore’s prepurchase investigation was cursory at best. The only such activity to which he testified consisted of several visits to other resorts in the area. Starting from his admitted lack of experience in the resort rental business and his then lack of familiarity with the area around the island, it is reasonable to expect more prudent behavior if the making of a profit was his primary motivation. Even more damaging to his case is the fact that, prior to purchase, he had no idea of what would be required by the Canadian authorities to obtain a commercial resort license, indeed whether the island could be licensed at all for those purposes. Inexplicably, he made no preliminary inquiries in this regard.
*724 Also, courts have sometimes found evidence of a profit motive in a taxpayer’s use of expert advice and services in operating a prospective venture. See, e.g., Patterson v. United States, supra; James Coe, 33 T.C.M. 592, 596 (1974); Harold I. Snyder, supra, Leland E. Rosemond, 10 T.C.M. 625 (1951). Yet, despite the consistently large sums of money spent on the island with virtually no return on the investment, plaintiffs have pointed to no attempts on their part of seeking expert guidance in their new endeavor. They admit to having had no prior experience in the resort rental business, nor did they ever employ anyone with such experience. In the face of obvious severe losses, this "do-it-yourself’ course of action is not indicative of a business-like operation conducted for profit. Harold I. Snyder, supra. There is no indication that the plaintiffs responded to this loss experience by changing their mode of operation or seeking knowledgeable local advice and assistance. This failure becomes even less understandable when it is recalled that Dr. Monfore’s home and professional business was far distant from the island property. Cf. Patterson v. United States, 198 Ct. Cl. 543, 553-55, 459 F. 2d 487, 493-94 (1972).
Another indication of a prudent profit-seeking operation is the careful maintenance of adequate books or records to account for expenses and income. See James Coe, 33 T.C.M. 592, 596 (1974); Leland E. Rosemond, 10 T.C.M. 625 (1951). Where these are lacking or extremely sketchy, the courts have been reluctant to find a profit motive. See, e.g., Johnson v. Commissioner, supra. While no one would suggest the necessity of employing a skilled accountant, the Monfores seem to have kept almost no written segregated records of income or expenses. Expenses incurred at the island were generally paid out of several accounts, including Dr. Monfore’s medical office account and the Monfores’ personal bank account. The absence of such commingling of funds has been cited as one favorable factor indicative of a concern for profits. See Walter E. Edge, Jr., 32 T.C.M. 1291, 1298-99 (1973). By the same token, where the taxpayer makes personal use of the property at issue, the Tax Court has looked on a failure to keep records of family use and to prorate expenses accordingly as militating *725 against a finding of a profit motive. See Johnson v. Commissioner, supra; Leland E. Rosemond, supra. It is not disputed that the Monfores spent time on the island both vacationing and working, yet no records were kept of these visits and their purpose, nor was any attempt made to prorate expenses accordingly.
Furthermore, to be consistent with an attempt to derive a profit from their Canadian property, a certain level of promotional activity may reasonably be expected of the plaintiffs. Where rental efforts are not at least somewhat aggressive, a profit motive is deemed less likely to exist. See, e.g., Carkhuff v. Commissioner, supra, Harold I. Snyder, supra.
Plaintiffs here made only minimal efforts to establish a resort reputation and made no attempt at formal advertising in the years at issue. Admittedly, as they contend, the evidence shows that advertising efforts were generally modest among the resort owners in the area, but the fact remains that some of the resort owners did advertise. It is certainly not unreasonable for the court to expect to find some promotional activity with respect to a venture alleged to be a profit-seeking one. But in the years at issue there was none. Even in later years promotional activity has increased only slightly.
Plaintiffs make light of their consistent losses during the years here involved, and it is true that a history of significant losses over a period of years, standing alone, does not prove a lack of profit motive. See, e.g., Patterson v. United States, supra. Nonetheless, continuous losses over the years have been deemed an important objective factor which should be considered, along with other factors, in determining the taxpayers’ true intent. Morton v. Commissioner, 174 F. 2d 302, 304 (2d Cir. 1949); see also, Schley v. Commissioner, 375 F. 2d 747, 750 (2d. Cir. 1967), Treas. Reg. 1.212-1(c), supra. A consistent pattern of losses becomes particularly significant when the taxpayers do not take prompt action in an effort to convert the losses into profits. Cf. Patterson v. United States, supra.
Here plaintiffs’ losses during the years at issue have ranged from $4,143 in 1970 to $6,405 in 1968. They argue that their losses were expected because of their inability to *726 obtain a commercial license and because the venture was then in its formative stages. Yet the evidence shows that six loss years elapsed between the time the island was purchased and the time that the major impediments to successful licensing were alleviated. In the interim, the plaintiffs were engaged in making alterations and additions to the island which, although they certainly increased the value of the property and made it a more pleasant place at which to vacation, were in no way required by the Canadian authorities. They offered no convincing evidence to show that this delay was beyond their control. It is true, as plaintiffs say, that losses may well be expected in the formative years of an enterprise, James Coe, 33 T.C.M. 592, 596 (1974), but such early losses attributable in large part to inaction on the part of the taxpayers will not be viewed with the same tolerance.
Plaintiffs point to the existence of multiple dwellings on this property and argue that this fact alone is so different from the typical vacation retreat that it shows the existence of a commercial profit motive. This, however, does not necessarily follow. International Trading Co. v. Commissioner, 275 F. 2d 578 (7th Cir. 1970). Although plaintiffs have shown some correlation between multiple dwellings and existing resort rental properties in the area of their island property, such a correlation when taken with all the other circumstances is not sufficient to carry the day. In this connection, it will be recalled that the property had the same number of units when the plaintiffs purchased it, and yet it seems never to have been used commercially before.
Plaintiffs rely heavily on their showing of efforts to renovate the island facilities and assert that this alone is indicative of their good faith effort to obtain a commercial license and eventually make a profit. Yet the same activities could be engaged in so as to make the island more comfortable for them, their family, and friends. To say, as the taxpayers have, that extensive renovations of the type they accomplished would not have been necessary unless commercial exploitation was intended is not persuasive. The fact that they waited six years to begin the changes which were cited as necessary by the licensing authority *727 indicates that a desire for prompt commercial operation was, at best, only a small part of plaintiffs’ motivation for the alterations.
Even if the plaintiffs had shown that their sole or primary intention in making the changes was to enable the beginning of rental operations, they would not necessarily have shown a profit motive. A motive to rent may only have been a part of an effort to minimize the costs of a vacation home as in Carkhuff v. Commissioner, supra, The taxpayers have the burden of showing a profit motive that went beyond an attempt to reduce the costs of their own recreational retreat.[7] It is reasonable to expect that a profit motive would be evidenced by a more consistently aggressive attempt to show a profit.
Although a taxpayer may certainly engage in more than one activity which is profit-motivated for tax purposes, when he has a primary occupation and spends only negligible amounts of time on the secondary venture, the latter is less likely to be found profit-oriented. See Harold I. Snyder, supra,; Walter E. Edge, Jr., supra. The plaintiffs’ tax returns indicate that Dr. Monfore’s medical practice grew steadily over the years in issue. There is no doubt that he was, and is, a busy physician. He testified that he was usually able to spend only a few week-ends on the island each year, an expenditure of time that is hardly consistent with a profit motive.
No one of these objective indications of an intent to make a profit is decisive in itself. The mere fact that the Monfores suffered consistent losses, that they did not advertise, that they did not keep adequate financial records, or that they did not spend a significant amount of time developing the commercial capabilities of the island would not defeat their claims if these factors did not exist in combination with others which fail to show a primary profit motive. The fact is that the taxpayers fail virtually *728 every judicially developed test for a profit motive. To reiterate, and to alliterate, the murky matter of motivation makes its way through all these cases and leaves the reader with a disquieting sensation of subjectivity. No doubt this is inevitable in such a nebulous area. Yet, draw the line we must, and while the question of where to draw that line may be difficult, as questions of degree almost always are, this must not trouble us, since as Mr. Justice Holmes once observed it is "the question in pretty much everything worth arguing in the law.” Irwin v. Gavit, 268 U.S. 161, 168 (1925).
Here it seems to me reasonably clear that the taxpayers’ actions and inactions with respect to their Canadian property, when viewed in their totality, have placed the Monfores on the wrong side of the line between personal expenditures and business expenses. Accordingly, their petition must be dismissed.[8]
CONCLUSION OF LAW
Upon the trial judge’s findings and opinion, which are adopted by the court, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed.

 Whereas the court adopts the trial judge’s separate .findings of fact, which are set forth in his report filed March 1,1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

 The plaintiffs claim for 1971 erroneously stated that $4,633.63 was disallowed as to the Canadian property. It is true that deductions related to the Canadian property were claimed in that amount on plaintiffs’ 1971 income tax return. However, a credit to the extent of the 1971 income from the Canadian property ($160) was allowed by IRS, leaving a total of $4,473.63 in disallowed deductions.

 However, later plaintiffs listed this cottage for rent as a part of the overall facility.

 The detailed facts are more fully developed in the findings of fact adopted by the court but not printed herein.

 Cf. his observation in De Loss v. Commissioner, 28 F. 2d 803, 804 (2d Cir. 1928) that "taxes, like other human affairs, must be determined without the gift of *720 divination.”

 One is reminded of the despairing dictum of the medieval judge that "the Devil himself knoweth not the mind of man.” Brian, J., in Y.B., 17 Edw. IV 1.

 As will become more apparent from the cases referred to below, considerable uncertainty has been generated in this area of tax law over the years, no doubt due in part to the subjective nature of the problem. In seeming agreement with the Llewellyn premise that "[F]or too much law, more law will be the cure” (Llewellyn, The Bramble Bush, p. 122 (1930)), a perhaps overly optimistic Congress has recently endeavored to remove the existing confusion by the enactment of section 601 of the Tax Reform Act of 1976, P.L. 94-455, 94th Cong. 2d Sess., approved October 4, 1976. While, of course, this intricate and complex provision has no application to the tax years involved in this case, it reflects the yoeman effort of the Congress to bring some coherent order into the area of deductions for expenses attributable to the rental of vacation-type homes. Whether this effort will be successful must await future developments.

 In this regard, see Treas. Reg. § 1.212-1(c) (1957) where it is stated that property held for the production of income under § 212 of the Internal Revenue Code must be primarily held for that purpose. If the property is held primarily for personal recreation, no deductions are permitted. In Malat v. Riddell, 383 U.S. 569, 572 (1966), the Supreme Court has defined the term "primarily” as meaning "of first importance” or "principally.”

 The parties have presented a considerable amount of evidence and argument concerning disputes over amounts expended and substantiation thereof. Since these issues would be reached only in the event that plaintiffs prevail in their claim for tax deductions under Sections 162, 165, 167, and 212, it is unnecessary for the court to consider them.