Richard E. **DUFFY** and Margaret A. Duffy

v.

The **UNITED STATES.**

No. 200–77.

United States Court of Claims.

Sept. 22, 1982.

Paul Frederic Marx, Los Angeles, Cal., atty. of record, for plaintiff.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, BENNETT, Judge, and MARKEY, Chief Judge,

United States Court of Customs and Patent Appeals.*

## OPINION
### PER CURIAM: **

The plaintiffs seek refunds of income taxes and assessed interest totalling $87,-636.90, plus interest for calendar years 1965, 1968, 1969, and 1971. The claims arise from two separate sets of facts: (I) the development and construction of a hotel project in Irvine, California; and (II) the purchase and use of two condominium units located on the island of Maui, Hawaii.[1]

The hotel project involves three issues: (1) whether a $34,500 payment to the lender was a loan commitment paid in the ordinary course of the plaintiff's trade or business; (2) whether $46,000 paid to a loan broker constituted a payment for his services or payment of a loan commitment fee or interest to the lender; and (3) whether a $170,-400 loss on the resale of a building, which the plaintiff was required to purchase from the lender as a condition of a loan, must be amortized over the life of the loan.

The Maui condominium transaction involves one issue: whether the plaintiffs held the units for the production of income or for personal use and pleasure.

For the reasons discussed below, the plaintiffs prevail on the $34,500 loan commitment fee issue, and the defendant prevails on the remaining issues.

## I.

A. 1. The plaintiff, Richard E. Duffy, since 1954 has been a licensed general contractor in California, and since 1957 has been in the business of developing, constructing and operating hotels and motels.

By 1960, Duffy had been involved in the following projects in Anaheim, California:

a. In 1957, Duffy designed and constructed the Peter Pan Motor Lodge. Duffy operated this motor lodge until he sold it in 1959.

b. In 1958, Duffy designed and constructed, as a general contractor, the Alamo Motor Lodge.

c. In 1959, Duffy designed and constructed, as a general contractor, the Jack and Jill Motel.

d. In 1959, Duffy designed and constructed the Kettle Motor Hotel, which he operated for approximately one year until its sale. An unnamed person was part-owner of the Kettle Motor Hotel.

e. In 1960, Duffy designed and constructed the Jolly Roger Inn. Duffy Motor Hotels, Inc., of which Duffy owns 100 percent of the stock, owns the Inn. Since 1960, Duffy has operated the Jolly Roger Inn. Jolly Roger Anaheim, Inc., operates a restaurant in the Jolly Roger Inn under a lease from Duffy Motor Hotels, Inc. Duffy owns 54 percent of the stock of Jolly Roger Anaheim, Inc.

The record indicates that from 1960 until 1967, Duffy was not involved in hotel/motel development, construction, and operation other than through his connection with Jolly Roger Inn.

In 1967, Duffy responded to a solicitation from the Irvine Company for proposals for the development and construction of a hotel on six acres of land owned by the Irvine Industrial Complex, a subsidiary. In mid-1967, the Irvine Company informed Duffy that his proposal for the hotel project (the Airporter Inn Hotel) had been selected from approximately one dozen proposals.

---

* Sitting by designation.

** This opinion has its basis in the opinion of Trial Judge Harkins, and its results are largely the same as his. There are, however, several deletions, modifications, and additions, primarily in part I.

The court adopts the trial judge's findings of fact, but they are not reproduced in this opinion. Any findings contained in this opinion that are not also embodied in the formal findings shall likewise be considered part of the court's findings.

1. Margaret A. Duffy signed various documents in the hotel project but did not otherwise actively participate in that transaction; she took an active role in the Maui condominium transaction. In part I, where appropriate, this opinion will refer only to "Duffy" or "the plaintiff."

Duffy contacted numerous lending institutions, but his efforts to obtain financing for the Airporter Inn Hotel project were complicated because he was not associated with a known hotel chain and because the project was to be built on leased ground. In late 1967 or early 1968, he engaged Milo A. Beers to seek financing for the project. Beers located a potential lender, the Home Savings and Loan Association. Before Duffy could consummate a loan agreement with the Savings and Loan, however, the latter canceled all commercial loans because of the death of its president.

After the loan from Home Savings and Loan fell through, Beers introduced Duffy to a loan broker, Donald B. Lehman. Lehman had connections with the Retirement Fund Trust of the Plumbing, Heating, and Piping Industry of Southern California (the "Trust") that allowed him to present the Trust's finance committee with feasible loan packages. Lehman felt that the Trust might be interested in financing the Airporter Inn project.

Although Lehman initially represented both the plaintiffs and the Trust in the negotiations concerning the Airporter Inn loan, by August 15, 1968, Bankers Mortgage Company of California ("Bankers") took over as the Trust's representative. Bankers, however, was never Duffy's agent.

As a result of Lehman's efforts (see below), on August 19, 1968, the plaintiffs executed a listing agreement with him pertaining to a construction loan for, and permanent financing of, the Airporter Inn. Lehman was identified in the agreement as the loan-acquisition agent for both loans. He was to receive for his services one percent of the total amount of both loans—a total of $46,000. In addition, the agreement identified Beers as the loan-originating agent for the permanent loan. Beers was to receive one percent of that loan—$23,000.

The Trust rejected Lehman's initial submission, in April or May 1968, of the proposed loan package for the Airporter Inn. Approximately one month later, Lehman suggested the loan request possibly could be approved if, in connection with the loan, the plaintiff purchased the Western Avenue Medical Building (medical building), which the Trust owned. The Trust wanted to sell the medical building for $500,000. At first, Duffy was not interested, but he later told Lehman that he would consider purchasing the medical building if Lehman could find a buyer to whom the building could be resold. Lehman located a buyer for the medical building, Pacific Atlantic Financial Corporation ("Pacific"). Pacific, however, was willing to pay considerably less than $500,000.

A letter dated June 27, 1968, prepared by Lehman and signed by Duffy, authorized Lehman to submit a loan package to the Trust that conditioned Duffy's purchase of the medical building for $500,000 ($200,000 in cash and $300,000 on a deed of trust) on a commitment by the Trust to lend $2,300,000 for construction and permanent financing of the Airporter Inn project. This letter was not submitted to the Trust. It is clear from this letter, however, that the sole reason Duffy agreed to purchase the medical building was to obtain the proposed loan.

2. The parties agreed to the terms of the purchase and resale of the medical building in mid-August 1968. It is unnecessary to describe the agreements and their subsequent amendments in detail. Rather, we will set out only the basic aspects of those agreements insofar as they are relevant to our decision.

Duffy agreed to pay the Trust $500,000 for the medical building. Duffy paid the Trust $130,000 (partly through escrow), and a first deed of trust secured the remaining $370,000. The sale was to close prior to October 15, 1968.

Duffy also agreed to pay $17,220 for six-months' prepaid principal and interest on the mortgage. In addition, he would pay $7,000 for six-months' prepaid taxes. Pacific was the beneficiary of these prepayments (see below). The agreement also required Duffy to pay the $500 in escrow costs. Finally, the Trust agreed to pay a $30,000 commission to Lehman.

Under the purchase agreement with Pacific, Pacific agreed to pay the plaintiff $370,100—$100 through the escrow and the remainder secured by a mortgage. The agreement essentially provided that Pacific would be substituted for Duffy on the $370,000 encumbrance held by the Trust (this was accomplished in early September 1966). Pacific did not have to make mortgage payments or pay taxes for six months as a result of Duffy's prepayment of those items. The resale to Pacific also was to close prior to October 15, 1968.

Duffy agreed (in a subsequent modification of the agreement with Pacific) to place $45,780 in escrow. Pacific was entitled to use $15,780 of that amount for repairs on the medical building. The other $30,000 was to "be set aside to pay the costs of Builder Control disbursements" in connection with the Airporter Inn. While Pacific did not receive the benefit of the $30,000, the payment of the costs through the escrow indicates that the double transfer of the medical building, the loan from the Trust and the construction of the Airporter Inn were interrelated.

Duffy's purchase from the Trust, and sale to Pacific, of the medical building were completed on September 26, 1968. Except for about $6,000, Duffy used proceeds of his loan from the Trust to pay for $30,000 of his downpayment obligation to the Trust (which the Trust apparently paid to Lehman as commission), for the $17,220 prepayment on the first deed of trust, for the $7,000 in prepaid taxes on the medical building, and for the $45,780 obligation under its escrow agreement with Pacific (see below).

As a result of the multiple transactions, the plaintiff paid $500,500 to the Trust for the medical building ($370,000 mortgage + $100,000 downpayment + $30,000 downpayment (commission subsequently to Lehman) + $500 escrow costs). Pacific simultaneously paid the plaintiff for the same building $330,100 ($370,000 mortgage + $100 escrow costs ± $40,000 ($15,780 improvements + $17,220 prepaid principal and interest + $7,000 prepaid taxes)). The net effect was that Duffy paid the Trust $170,400 more for the building than the amount he obtained from Pacific (which we treat as the building's fair market value).

3. Development of a loan from the Trust for the Airporter Inn project proceeded simultaneously with the purchase and sale of the medical building. An undated, proposed letter agreement, signed by Duffy but not by the Trust, stated the terms of the loan agreement. The Trust would make a $2,300,000 loan at 7.6 percent interest to the plaintiff in two phases, to coincide with the two phases of the hotel's construction. In the letter, Duffy also agreed to pay through Bankers a loan commitment fee of $34,500 to the Trust upon his approval of the loan and commitment letter. (Duffy paid the commitment fee by check a few days later.) The Trust also was to agree to pay Bankers 0.1 percent of all interest collected for servicing the loan.

On September 20, 1968, the plaintiff, the Trust, and Bankers executed a loan agreement for the first phase of the $2,300,000 loan. The $1,544,000 amount of the first phase was evidenced by a note secured by a deed of trust. The Trust agreed to disburse $135,000 upon recordation of the loan.

The initial $135,000 disbursement of loan proceeds was paid through the escrow on September 26, 1968. However, the Trust instructed the escrow agent to hold $34,500 for the account of Bankers (the record does not indicate the purpose of this payment). The escrow agent also retained $6,313.11 to cover title, recording, and escrow fees connected with the loan. The remaining $94,186.89 was used in connection with the purchase and sale of the medical building (see above).

B. The plaintiffs assert that the $34,500 paid to the Trust through Bankers on August 19, 1968, represented a loan commitment or standby fee that is deductible as a current business expense under Revenue Ruling 56–136 (1956–1 C.B. 92) and section 162 of the Internal Revenue Code (the

"Code").[2]  A loan commitment fee is paid to a potential lender for the purpose of having funds made available for a specified period at a fixed interest rate.  Revenue Ruling 56–136 held that commitment fees or stand-by charges may qualify as business expenses deductible under section 162.

Although the defendant advises us that the revenue ruling presently is under reconsideration by the Internal Revenue Service, it does not challenge that ruling here.  Rather, conceding that the $34,500 properly can be characterized as a loan commitment fee within the meaning of the ruling, the government argues that the fee cannot be deducted as a business expense under section 162.

■  To come within section 162, the item claimed as a business expense must be "(a) 'paid or incurred' within the taxable year; (b) incurred in carrying on a 'trade or business'; and (c) both 'ordinary and necessary.'"  *Hill v. Commissioner,* 181 F.2d 906, 908 (4th Cir. 1950); *Richmond Television Corp. v. United States,* 345 F.2d 901, 904 (4th Cir.), *vacated and remanded on other grounds,* 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965).  It is undisputed that the plaintiffs paid the expense in 1968, and that the payment was both ordinary and necessary.  The defendant relies entirely on the contention that Duffy was not carrying on a trade or business related to hotel development and construction in 1968.

The government seems to be arguing either (1) that before 1968, the plaintiff had not been engaged in the business of developing and constructing hotels to be operated by himself (as opposed to third parties), or (2) that if he was in that business prior to 1960, he left it when he formed Duffy Motor Inns.  If either argument were correct, according to the government, the loan commitment fee would constitute a cost required to "start-up" the plaintiff's new business in 1978.  The courts have distinguished start-up costs from business expenses deductible under section 162 and have required start-up costs to be capitalized.  *See Blitzer v. United States,* Ct.Cl., 684 F.2d 874 at 879–881 (1982); *Richmond Television Corp. v. United States,* 345 F.2d at 905; *Francis v. Commissioner,* 36 T.C.M. (CCH) 704, 707 (1977).

We find, however, that the plaintiff was engaged continuously in the business of developing, constructing, and operating hotels and/or motels since prior to 1960.  Our finding is based on the particular facts here present.

First, Duffy was involved in the business of developing, constructing, *and* operating hotels and/or motels.  The government argues that there is a distinction between the business of constructing hotels for others and of constructing hotels to be operated by the contractor.  According to the government, because Duffy built hotels prior to 1960 for others, that business was different from the business involved in the Airporter Inn project.

Prior to 1960, however, Duffy did not build hotels exclusively for others.  Duffy constructed at least two of the pre-1960 projects, the Peter Pan Motor Lodge and the Kettle Motor Hotel, to be operated at least in part by himself.  The facts that those motels were sold eventually or that Duffy built one or two other projects as a general contractor do not detract from the conclusion that Duffy was engaged in the development, construction, and operation of motels prior to 1960.

Second, Duffy did not leave the business when in 1960, he formed Duffy Motor Inns to own the Jolly Roger Inn.  "[I]n determining the trade or business of an individual taxpayer, the business activities of his closely held corporation will not be attributed to him."  *Tibbals v. United States,* 176 Ct.Cl. 196, 208, 362 F.2d 266, 272 (1966), *citing Whipple v. Commissioner,* 373 U.S.

---

**2.**  Unless otherwise stated, references are to the Internal Revenue Code of 1954, Income Taxes, 26 U.S.C. §§ 1 1552 (1976).  26 U.S.C. § 162 reads, in part:

"Trade or business expenses

"(a) *In General*

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. . . ."

193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963); *see also, Burnet v. Clark,* 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397 (1932); *Dalton v. Bowers,* 287 U.S. 404, 409–10, 53 S.Ct. 205, 206 ·207, 77 L.Ed. 389 (1932); *Madison Gas & Electric Co. v. Commissioner,* 72 T.C. 521 (1979), *aff'd,* 633 F.2d 512 (7th Cir. 1980). In *Tibbals,* however, after recognizing that attribution is prohibited, we stated

> that a taxpayer may be individually in the same business as his corporation, may make that business his own, or may utilize the company in his own business. It is therefore appropriate, in circumstances such as these, to see whether the taxpayer uses his controlled company ... to implement or further his own personal business, as he easily can.

176 Ct.Cl. at 208, 362 F.2d at 272 (footnote omitted).

In the present case, Duffy employed (rather than was employed by) Duffy Motor Inns and Jolly Roger Anaheim, Inc., in his business. Duffy entered the relevant business sometime before the creation of the corporations. Several of the hotels that he operated were not owned by either. of those corporations but were owned by Duffy in his individual capacity. The record does not show that Duffy Motor Inns ever owned any motel other than the Jolly Roger or that it ever was intended to own or to operate any other aspect of Duffy's overall business. Duffy formed the corporations with limited and specific goals. Finally, the Irvine Company awarded the Airporter Inn project to Duffy, not to Duffy Motor Inns. That decision was based not on Duffy's record as an employee of the latter firm but on Duffy's own personal experience as a developer, constructor, and operator of motels since the 1950's.

The fact that Duffy did not develop or construct any motels between 1960 and 1967 does not alter our conclusion. This seven-year hiatus was not particularly significant inasmuch as, without interruption, Duffy continued to use two closely held corpora-

tions "to implement his own personal business"—that of owning and operating the only motel in which he continued to have an interest. *Tibbals v. United States,* 176 Ct.Cl. at 208, 362 F.2d at 272.

Since we hold that Duffy had been, and continued to be, engaged in the development, construction, and operation of hotels and/or motels in 1968 when the $34,500 commitment fee was paid, *Richmond Television Corp.* and its progeny are inapposite. The commitment fee cannot be characterized as a start-up cost inasmuch as the business was ongoing when the expense was incurred. Rather, it was a business expense properly deducted in the year paid.

C. Duffy paid Lehman a total of $46,000 over a three-year period: $15,000 in 1968; $21,500 in 1969; and $9,500 in 1970. These payments were for Lehman's services in connection with the construction loan and permanent financing for the Airporter Inn Hotel project.

1. Expenses paid or incurred in obtaining loan financing are capital expenditures that must be amortized over the life of the loan. *Duncan Industries, Inc. v. Commissioner,* 73 T.C. 266, 275 (1979); *Trivett v. Commissioner,* 36 T.C.M. (CCH) 675, 680–81 (1977), *aff'd,* 611 F.2d 655 (6th Cir. 1979); *Francis v. Commissioner,* 36 T.C.M. (CCH) at 707; *S & L Building Corp. v. Commissioner,* 19 B.T.A. 788, 794 (1930), *rev'd on other grounds,* 60 F.2d 719 (2d Cir. 1932), *rev'd,* 288 U.S. 406, 53 S.Ct. 428, 77 L.Ed. 861 (1933); *Lovejoy v. Commissioner,* 18 B.T.A. 1179, 1182 (1930). The payments to Lehman covered services rendered in locating and arranging financing for the Airporter Inn and thus were for capital expenditures to be amortized over the life of the loan.

The plaintiffs claim the $46,000 paid to Lehman represents either a loan commitment fee or additional interest, and therefore should be deducted from income under either section 162 or section 163[3] of the

---

**3.** 26 U.S.C. § 163 (1976) reads, in part:
"(a) General Rule.

"There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

Code. The plaintiffs' theory appears to be that because Lehman, who received the money, was the Trust's agent, the plaintiffs actually paid the $46,000 to the Trust either for a commitment of loan funds by the Trust or for the use of the Trust's money.

First, the plaintiffs have failed to establish that Lehman was the Trust's agent. The only evidence that Lehman served in that capacity was Lehman's relationship to the Trust that allowed him to present its finance committee with promising loan proposals. As a result, Beers apparently introduced Lehman to the plaintiffs as the Trust's representative.

Beyond this, however, the evidence indicates that Lehman was Duffy's agent. On August 19, 1968, the plaintiffs entered into an agreement with Lehman as the "loan-acquisition" agent for the two loans and as "agent for the undersigned" Mr. and Mrs. Duffy. Prior to that date (and prior to the finalization of the loan agreement), Bankers had been substituted for Lehman as the Trust's agent in the deal. Since this substitution occurred prior to the plaintiff's payment of the $46,000, the payment cannot properly be viewed as made to Lehman as the Trust's agent.

Second, even if Lehman were the Trust's agent, we still could not conclude that the payment constituted a loan commitment fee or interest. As noted in part IB above, Duffy otherwise paid a $34,500 loan commitment fee to the Trust. We doubt that a second such fee would have been necessary. In addition, we cannot say that a payment received *and* retained by someone other than the lender—even an agent of the lender—can be characterized as a loan commitment fee (see the discussion below concerning interest versus payment for services). *Cf. Lay v. Commissioner,* 69 T.C. 421, 438 (1977) ("[a]t no time did the [loan brokerage company receiving the payment] loan any of its funds").

Similarly, since the August 19th agreement shows that the $46,000 payment was in consideration of *services* rendered by Lehman, it was not "compensation paid for the use or forbearance of money"—that is,

it was not interest. *See Deputy v. du Pont,* 308 U.S. 488, 497–98, 60 S.Ct. 363, 368–369, 84 L.Ed. 416 (1940); *Blitzer v. United States,* 684 F.2d at 882; *Wilkerson v. Commissioner,* 70 T.C. 240 (1978). In addition, the fact that although Lehman retained the fee he did not lend any of his own funds to the plaintiffs, confirms that the payment was for services, not for the use of money. *Lay v. Commissioner,* 69 T.C. at 438. Since Lehman received the payment as a commission or a brokerage fee in connection with the loan from the Trust, the plaintiffs must amortize those payments over the life of the loan. *Wilkerson v. Commissioner; Lay v. Commissioner,* 69 T.C. at 439; *Longview Hilton Hotel Co. v. Commissioner,* 9 T.C. 180 (1947); *cf.* Rev.Rul. 57–400, 1957–2 C.B. 520 ("finders fees" paid by lenders to third parties must be amortized over the life of the loan).

■ 2. In their exceptions to the trial judge's findings, the plaintiffs for the first time argued that if the $46,000 payment is a capital expense, the plaintiffs should be required to amortize only $23,000 of that payment over the life of the loan. The other $23,000, according to the plaintiffs, was paid to Lehman in consideration for his services in obtaining a short-term construction loan. The plaintiffs argue that since a separate short-term loan was never obtained, the other $23,000 either should be deductible in the year paid as an abandonment loss under section 165(a) of the Code or should be amortized only over the 1½ years required to construct the Airporter Inn.

We express no opinion on the merits of the plaintiffs' arguments since the issue is not properly before us. The plaintiffs should have raised the argument at the trial below; they cannot raise it for the first time when they come before the court on exceptions to the trial judge's recommended decision. *See Barrett v. United States,* 186 Ct.Cl. 210, 212, 405 F.2d 502, 503 (1968) (footnote *); *WRB Corp. v. United States,* 183 Ct.Cl. 409, 417 (1968).

The plaintiffs' sole excuse for not raising the argument below is that until the trial

judge held that the fees did not constitute interest or a loan commitment, there was no issue as to the period of amortization. Nevertheless, the plaintiffs obviously were aware that the defendant was arguing before the trial judge that the $46,000 fee was a capital expenditure. Further, it was clear at that time that if the government prevailed in its characterization, the fees would have to be amortized over some period. The only reason the trial judge did not consider the length of the period was because the plaintiffs seemingly accepted the government's calculation of that period.

The plaintiffs could have argued in the alternative on the present point. That they were familiar with the practice of alternative pleading is revealed by their handling of the $170,400 loss on the medical building (part ID, below). There they did not hesitate to make alternative arguments.

D. As a condition of its loan of $2,300,-000, the Trust required Duffy to purchase the medical building. Duffy refused to do so until arrangements were made to resell it to Pacific. As a result, Duffy paid $500,-500 for the medical building and immediately resold it to Pacific for $330,110.

█ The plaintiffs claim that the $170,-400 difference should be treated as an ordinary loss deductible in full under section 165 of the Code or, alternatively, under section 163 as interest, deductible in the year paid. The defendant, on the other hand, argues that the difference was an inducement to obtain the loan and thus a capital expense, and, on the facts, was not compensation for the use of money. Alternatively, the defendant argues if the payment was disguised interest, its prepayment "materially distorts income" and therefore it must be amortized over the life of the loan. We hold for the defendant.

1. The plaintiffs' argument that the sale to Pacific resulted in an ordinary loss incurred in the conduct of Duffy's normal business is based on the contention that the medical building transactions were separate and independent from the loan. The defendant argues that the purchase, sale, and loan were a single transaction and therefore

that the $170,400 difference between the purchase and sale prices represents an expense connected with the loan. A factual inquiry is required to resolve the dispute.

The plaintiffs insist the legal form and documentation of the medical building transactions are a reflection of economic reality. The plaintiffs emphasize that the medical building escrow agreements created fixed liabilities, that the deeds transferred legal title, that the cash payments were real, and that for a transitory instant on September 26, 1968, the plaintiffs took legal title and would have been compelled to retain ownership until another buyer could have been found if Pacific had defaulted.

The defendant recognizes the legal formalities but argues that the loan purchase and sale were parts of a single agreement. Further, the defendant questions whether, as a matter of law, Duffy ever was liable for the $370,000 mortgage on the medical building because on September 5, 1968, Pacific and the Trust released the plaintiffs from that liability by an amendment to the escrow agreement. The mortgage was not executed until the transactions closed on September 26, 1968.

█ The defendant's view of the economic realities of the entire transaction is correct. Substance prevails over form that does not coincide with economic reality, and substance determines the incidence of taxation. *Commissioner v. Hansen,* 360 U.S. 446, 461, 79 S.Ct. 1270, 1278–1279, 3 L.Ed.2d 1360 (1959); *Cox v. Commissioner,* 56 T.C. 1270, 1280 (1971).

The record shows that the Trust would not make the loan to Duffy unless he agreed to purchase the medical building for $500,000. Duffy, in turn, would not make the purchase unless Lehman could find a buyer to whom it could be resold. By August 15, 1968, Lehman had found Pacific, and the major elements of the mutually dependent transactions had been agreed upon. All documents with respect to the purchase and sale of the medical building were executed on August 15, 1968. All escrow accounts on the medical building

transfers were to close by October 15, 1968. The escrow agreement between Duffy and Pacific was amended to require Duffy to make a $30,000 "Builders Control disbursement" in connection with the Airporter Inn.

Duffy had no need for, nor did he want, the medical building; he, however, did need the $2,300,000 loan. Monies released to the plaintiff by the Trust under the $2,300.000 loan were used to pay various medical building costs for improvements and taxes, the benefits of which went to Pacific and not to the plaintiff. The record establishes that for tax purposes the three transactions were mutually dependent.

The economic reality of these mutually dependent transactions is that the plaintiff paid $170,400 of his own funds to the Trust as an inducement to make the loan. The $170,400 difference between the purchase price paid, and the sales price received, by Duffy constituted an expense that he was required to incur in exchange for the loan. *Penn Yan Agway Cooperative v. United States,* 189 Ct.Cl. 434, 417 F.2d 1372 (1969).

2. The remaining issue is the period over which the $170,400 must be deducted. In the first instance the answer depends upon whether the payment constituted prepaid interest or a payment for services in connection with obtaining a loan. *See Blitzer v. United States,* 684 F.2d at 881–883; *Wilkerson v. Commissioner; Lay v. Commissioner; cf. Penn Yan Agway Cooperative v. United States,* 189 Ct.Cl. at 448, 417 F.2d at 1379 ("the borrower in effect parted with additional money . . . and . . . received nothing in return other than the use of the lender's money").[4] If the payment was prepaid interest, then it is deductible by a cash-basis taxpayer in the year paid unless it distorts income (see below); however, if it was a payment for something other than the use of the Trust's money, it

must be amortized over the life of the loan. *See, e.g., Lay v. Commissioner,* 69 T.C. at 439; *cf. Lovejoy v. Commissioner,* 18 B.T.A. at 1182.

The government argues that in addition to being prepaid interest and a payment for services, the $170,400 may represent a payment to induce a loan that must be amortized over the life of the loan. We reject this possibility because the courts have never distinguished between a payment to induce a loan and interest, and this court can perceive no principled distinction.

The government's argument concerning the distinction between interest and an inducement to make a loan is premised exclusively on the 50-year old decision in *Old Colony Railroad Co. v. Commissioner,* 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484 (1932). In that case, the Court refused to reduce the taxpayer's interest deduction to reflect the premium over the par value of the bonds that the taxpayer received when issuing them. The Court merely held that the Service could not adjust the allowable interest deduction to reflect the premium. *Id.* at 561, 52 S.Ct. at 214.

The $170,400 in issue here was hardly the equivalent of a premium paid for a bond traded in an organized market. Furthermore, it is impossible to read *Old Colony Railroad* as creating a general distinction between inducements to make a loan and interest.

The government points to no subsequent case in which a distinction between interest and an inducement to make a loan is drawn. However, there are numerous cases that make it clear there is no such distinction. *See Penn Yan Agway Cooperative v. United States; Wilkerson v. Commissioner; Baird v. Commissioner,* 68 T.C. 115 (1977);

---

4. At various points in their briefs, both the plaintiffs and defendant have argued that *Penn Yan Agway* was overruled by the Supreme Court in *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972). While *Mississippi Chemical* did overrule one aspect of *Penn Yan Agway* (that related to the interpretation of the Farm Credit Act of 1955, 69 Stat. 655), that aspect of the opinion is irrelevant to the present case. *Penn Yan Agway's* statements and holdings concerning the general treatment of the difference between the purchase price and fair market value of an asset that the lender requires a borrower to purchase remains intact. Also, its discussion of a prepayment to induce a loan was not affected by the *Mississippi Chemical* decision (see part ID2, below).

*Enoch v. Commissioner,* 57 T.C. 781, 794–95 (1972); Rev.Rul. 69–582, 1969–2 C.B. 29. For example, in *Penn Yan Agway,* this court noted that a payment "to induce a loan has been held to be deductible as interest." 189 Ct.Cl. at 447, 417 F.2d at 1379.

Also, the government has suggested, and we can find, no objective, reliable criteria by which to distinguish interest from an inducement to make a loan. It is impossible to distinguish what the government calls a payment to induce a loan from points paid to a lender. It is settled, however, that points (where they are not paid for some service and where they do not distort income) are deductible as interest. *See, e.g., Baird v. Commissioner,* 68 T.C. at 129–30; Rev.Rul. 69–582, 1969–2 C.B. 29.

The sole distinction, therefore, is between a payment for the "use or forebearance of money," i.e., interest, and a payment for services rendered in connection with the loan. The burden is upon the taxpayer to prove the proper characterization of the payment. *Enoch v. Commissioner,* 57 T.C. at 795.

■ In this case, the plaintiffs have failed to prove that the $170,400 represented exclusively interest. In fact, the Trust paid $30,000 of that amount to Lehman as a commission and $500 of the total covered escrow costs. On the other hand, nothing in the record indicates that $170,400 worth of services, not otherwise compensated, were performed in connection with the entire loan transaction. *See Blitzer v. United States,* 684 F.2d at 882; *cf. Wilkerson v. Commissioner,* 70 T.C. at 255–57 ("only a small part of the initial service charges . . . was attributable to services"). However, even if the entire $170,400 were deemed to be interest, the plaintiffs nevertheless would have to amortize that amount over the life of the loan. This is because in this case the Commissioner found that deduction of the entire $170,400 in the year paid would result in a material distortion of income. *See Baird v. Commissioner,* 68 T.C. at 130–31.

3. Section 163(a) of the Tax Code states that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The plaintiffs, cash-basis taxpayers, argue that since they paid the $170,400 in 1968, they may take the entire deduction in that year.

Section 446(b) of the Code, however, provides that "if the method [of accounting, i.e., cash-basis or accrual] used [by the taxpayer] does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." "The term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item." Treas. Reg. § 1.446–1(a)(1) (1981); *see also Baird v. Commissioner,* 68 T.C. at 131 (and cases cited therein).

■ The Commissioner has broad discretion under section 446(b) in determining whether a method of accounting clearly reflects income. *Commissioner v. Hansen,* 360 U.S. at 467, 79 S.Ct. at 1281–1282. In the statutory notice of deficiency, the Commissioner informed the plaintiffs that the payment here disputed had to be amortized over the life of the loan because the payment represented services rendered and/or its deduction in the year paid would distort the plaintiffs' income. The plaintiffs in this case have a substantial burden of proof to show that the Commissioner abused his discretion in making that determination. *Baird v. Commissioner,* 68 T.C. at 131. The plaintiffs have not met that burden.

The Commissioner in the statutory notice explained that the prepayment distorted income because the amount prepaid was "for a period in excess of five years." Revenue Ruling 68–643 (1968–2 C.B. 76, 77) supports this position, stating "[i]f interest is prepaid for a period extending more than 12 months beyond the end of the current taxable year, the deduction of such prepaid interest in the [year paid] . . . will be considered as materially distorting income." In this case, the $170,400 was paid for the use of money over the entire life of the 25-year loan. *See Baird v. Commissioner,* 68 T.C. at 131–32.

Furthermore, in this case the plaintiffs' income in 1968, was only about two-thirds of the $170,400 prepayment. Rev.Rul. 68–643, 1968–2 C.B. 76, 77. Also, the plaintiffs received only $135,000 in loan proceeds in the year in which the deduction was taken. It also must be remembered that the plaintiffs did not earn any income on the Airporter Inn itself until several years later. *See Baird v. Commissioner,* 67 T.C. at 132. Finally, at least part of the $170,400 was not interest but was compensation for services rendered.

The plaintiffs argue that despite these facts the $170,400 does not distort income because the payment was not tax-motivated but rather had a substantial business purpose. While we agree that the presence or absence of a tax motivation is significant (*see McMullan v. United States,* Ct.Cl., 686 F.2d 915 at 921–922 (1982)), it is only one factor to be considered in determining whether there was a material distortion of income. *Baird v. Commissioner,* 68 T.C. at 133. Although the trial court made no findings on this issue, we assume *arguendo* a tax motive was absent. Nevertheless, in light of the other factors, we cannot say the Commissioner abused his discretion in finding that deduction of the $170,400 payment in the year paid would distort income. *See McMullan,* 686 F.2d at 922. Consequently, pursuant to the Commissioner's finding, the plaintiffs must amortize the $170,400 over the full life of the Airporter Inn loan.

## II.

On July 27, 1968, Mrs. Duffy signed a sales contract for the purchase of two adjoining condominium units in the Maui Eldorado, a complex located on beachfront property on the island of Maui, Hawaii, for a total purchase price of $91,300. The Maui Eldorado owned 1500 feet of private beach on Kanapalaui Beach, a half-dozen swimming pools, and two tennis courts. It overlooked a private golf course; however, condominium owners did not receive special privileges at the golf course. Each unit contained its own private entrance, a bedroom, and a bathroom; one unit also contained a large kitchen and a living room. There was a common entry between the two units.

Mrs. Duffy purchased the condominium while on a vacation with her daughter and friends after a one-day search for real estate to purchase on Maui. She purchased at the Maui Eldorado because of its potential to realize an increase in value and because of its rental program.

The established rental program permitted owners personal use of their units two weeks every year, during periods of the owners' meetings. Owners could schedule their units for personal use during the balance of the year only with advance written notice. The rental program provided that owners could not rent the units except through the rental office and could be refused personal use if the units were already scheduled for rent.

On her return to California, after consideration of the purchase contracts, Mr. and Mrs. Duffy decided to go through with the acquisition. They did not investigate or make an estimate of the number of days the units could be rented, nor did they project a cash flow, positive or negative.

On the assumption that the condominium would be completed, Mr. and Mrs. Duffy, their son and daughter, and Mrs. Duffy's mother and stepfather visited Maui, in December 1970. Their units were not yet completed, so they stayed in another condominium in the complex.

On March 4, 1971, the plaintiffs purchased furniture for their units. The plaintiffs testified that the furnishings were of a commercial grade, and would not have been selected for their personal use. For $8,077.78, plus a finance charge of $1,872.47, the plaintiffs contracted to receive carpets, drapes, furniture, kitchen appliances and utensils, and bedding. The agreement noted that the "Buyer hereby represents and agrees that the Property is bought and is to be used primarily for leasing to customers."

Later in March 1971, the plaintiffs sent Mario Delessi, manager of the Jolly Roger Inn, to check on the progress of the condo-

minium. Delessi reported that the units were furnished only partially. In April 1971, the plaintiffs sent Peter Jepsen, Manager of the Airporter Inn, to check on the condominium units. Jepsen reported that some of the condominium furnishings were missing.

During 1971, the plaintiffs allowed the following people to stay at their condominium free of charge:

| Name | Occupation | Period or Days of Stay | |
|------|-----------|------------------------|---|
| 1. Mario Delessi | Manager, Jolly Roger | March 1971 | 10 |
| 2. Peter Jepsen | Manager, Airporter Inn | April 1971 | 8 |
| 3. Manfred K. | Captain, Airporter Inn | 1971 | 6 |
| 4. Ed Monday | Chef, Jolly Roger | October 1971 | 15 |
| 5. Elsie Rainey | Manager, Jolly Roger | 1971 | 5* |
| 6. Fran Rainey | Waitress, Jolly Roger | 1971 | 5* |
| 7. Lois Hamlet | Staff, Airporter Inn | October 1971 | 7** |
| 8. Winn Bundy | Staff, Airporter Inn | October 1971 | 7** |

\* stayed same days
\*\* stayed same days

The plaintiffs occupied their condominium in 1971 for a total of 36 days during the following time periods: May 1 through May 15, August 1 through August 16; and October 28 through November 5. The August 1 through August 16 period (15 days) was used for personal recreation; the balance of the time spent in the units in 1971 was in conjunction with owners' meetings.

In their income tax returns, the plaintiffs reported no income in 1971 for the property and claimed $19,461 deductions. The Service allowed deductions for interest and taxes ($6,204 total) and disallowed the remaining deductions for expenses and depreciation.

In 1970 and 1971, the plaintiffs did not have any gross rental income from the units. The plaintiffs attributed this failure to obtain rental income to start-up problems and mismanagement. The plaintiffs, however, received $2,758.76 in gross rentals from May 1 through December 21, 1972. In 1976, the plaintiffs sold the units for $127,500.

■ The issue here is whether the expenses incurred by the plaintiffs, with respect to their condominium, are deductible under sections 167(a)(2) [5] and 212(2) [6] of the Code because the condominium units primarily were held for the production of income. Whether property is held primarily for the production of income, rather than for hobby, sport, or recreation is a question of fact to be determined from all the circumstances in the case. *Monfore v. United States,* 214 Ct.Cl. 705, 720–22 (1977); *Johnson v. Commissioner,* 59 T.C. 791, 814 (1973), *aff'd on other grounds,* 495 F.2d 1079 (6th Cir.), *cert. denied,* 419 U.S. 1040, 95 S.Ct. 527, 42 L.Ed.2d 317 (1974).

The plaintiffs assert their condominium units qualify for the deduction primarily because the facts show commitment to the rental pool, an anticipation of gain on disposition, and because the use by the plaintiffs for personal pleasure was *de minimis.* The defendant claims that the plaintiffs' predominant purpose in holding the condominium units was for recreational use, and that the units were rented in an effort to minimize the expense of a vacation home.

■ Property offered for rent can be property held for the production of income if the facts show that the predominant purpose for holding, and usage of, the property was to realize a profit. *Monfore v. United States,* 214 Ct.Cl. at 721–22; *Johnson v. Commissioner,* 59 T.C. at 814; *Carkhuff v. Commissioner,* 425 F.2d 1400 (6th Cir. 1970). Absence of a profit during any given period

---

5. 26 U.S.C. § 167 reads, in part:
  "(a) General Rule.
  "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
    \*    \*    \*    \*    \*    \*
  "(2) of property held for the production of income."

6. 26 U.S.C. § 212 reads, in part:
  "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
    \*    \*    \*    \*    \*    \*
  "(2) for the management, conservation, or maintenance of property held for the production of income; ...."

will not preclude the deduction. This court has said:

> [T]he best evidence of the taxpayer's intent to make a profit must arise from his overt efforts to accomplish that result and, albeit to a lesser extent, his actual accomplishments in that regard.

*Monfore v. United States,* 214 Ct.Cl. at 723. While heed is paid to the taxpayers' subjective testimony, "greater weight is to be given to objective facts than to the taxpayers' mere expression of intent." *Johnson v. Commissioner,* 59 T.C. at 815.

■ The facts in this case establish that the plaintiffs' purchase of the Maui condominium units was not a transaction motivated by a desire to realize a profit. Instead, the plaintiffs purchased and used the units for the purpose of recreation and sport. Participation in the rental program was to minimize the expense of a recreational facility.

The plaintiffs conducted only a cursory prepurchase investigation on the island of Maui. The one-day search, the failure to estimate potential rental use, the absence of projections on cash flow, the failure to maintain records on income and expenses, while individually not determinative, taken on the record as a whole are persuasive that the purchase was not motivated primarily by a desire to realize a profit. These factors support the conclusion that plaintiffs purchased the property with recreational and vacation use in mind.

From May 1971, when the plaintiffs' condominium units were ready, until December 1971, the plaintiffs vacationed at their condominium on three different occasions. Even though two of those occasions involved owners' meetings, these trips also were devoted to recreational activities. During this period, various personnel were permitted to vacation at the condominium free of charge. The plaintiffs and their guests used the facility for recreational purposes, free of charge, for a total of 105 days. This is not *de minimis,* and such usage, coupled with the total absence of any paying guests, is indicative of a lack of profit motive.

The plaintiffs attribute the lack of rental income to mismanagement and start-up costs. Activities that suffer losses in their initial stages still may qualify as activities engaged in for profit. Other factors, however, must be present to support a conclusion that the activity was profit oriented and to negate the inference that the taxpayers were "interested primarily in having the tax collector 'share in the cost' of a vacation home." *Ong v. Commissioner,* 48 T.C.M. (P–H) ¶ 79,406 at p. 1574 (1979).

The fact that the plaintiffs' losses may or may not have been due to poor management and start-up costs does not establish that the condominium units were held for profit. The plaintiffs bear the burden of establishing that the condominium units were held for profit:

> All deductions, whether with respect to individuals, or corporations, are a matter of legislative grace, and unless the claimed deductions come clearly within the scope of the statute, they are not to be allowed. The burden to make that showing rests upon the taxpayer.

*International Trading Co. v. Commissioner,* 275 F.2d 578, 584 (7th Cir. 1960), *quoted in Monfore v. United States,* 214 Ct.Cl. at 721.

The plaintiffs have failed to meet their burden and cannot claim deductions under sections 167(a) and 212(2) of the Code.

## CONCLUSION:

The plaintiffs are entitled to recover on the issue of the $34,500 loan commitment fee paid to the Trust. Judgment is entered for the defendant on all other issues. The case is remanded to the Trial Division for further proceedings under Rule 131(c) to determine the amount of refund due.